In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3403

TRISTANA HUNT,

*Plaintiff-Appellant,*

*v.*

WAL-MART STORES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 05924 — **Charles R. Norgle**, *Judge.*

ARGUED MAY 23, 2019 — DECIDED JULY 26, 2019

Before BAUER, MANION, and BRENNAN, *Circuit Judges.*

BAUER, *Circuit Judge.* Tristana Hunt worked the overnight shift in the electronics department of a Wal-Mart store and Daniel Watson was her supervisor. After Watson made several unprofessional remarks toward Hunt over a four-month period, Hunt filed a complaint with human resources. Wal-Mart promptly investigated the claims but was unable to

substantiate them. Hunt then filed a complaint in federal court alleging Watson sexually harassed her by creating a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. At summary judgment, the district court held that Wal-Mart established the *Faragher-Ellerth* affirmative defense to liability because it reasonably prevented and corrected sexual harassment, and Hunt unreasonably delayed in reporting the harassment. We agree and affirm.

## I.  BACKGROUND

Before Watson and Hunt worked together on the night shift, Watson worked as a supervisor on the day shift. While working on the day shift Watson was accused of sexually harassing an individual he supervised, Toyanna Campbell. Campbell filed a complaint on October 24, 2012, which informed human resources that Watson had told Campbell he liked her several times. After she said she did not like him he closed the door and window to his office, put his hand on her arm, and refused to let go of her until she screamed. Watson was provided with a written "coaching" for the conduct described in the complaint. "Coaching" is the Wal-Mart equivalent of being written up and is intended to provide instruction and assistance when an employee's performance is not up to Wal-Mart's standards.

On November 7, 2012, Campbell filed another complaint alleging Watson had acted inappropriately. According to the complaint he asked her what perfume she was wearing, complimented her on her "musk," implied that she liked him when she called him to the front of the store, informed her that he was single and asked if she was single, told her he was

looking for a girlfriend, and told her he really liked her. In response to this incident, Wal-Mart provided Watson with a second written coaching and moved him to the overnight shift.

Hunt met Watson for the first time during a shift in May 2013. Watson came up to her and asked her why she was wearing a particular shirt, saying that he could see her breasts, and then commented that he did not understand how a woman could have breasts so large despite having a small body. Hunt was uncomfortable and walked away from the incident to avoid further comments. About a month later, Watson walked up behind Hunt while she was bending over, stood close to her, and made another comment about her breasts. Hunt told him that his comments were inappropriate and again walked away. This time Watson followed her and told her he wanted to shower with her and feel her breasts.

On June 25, 2013, Hunt showed Watson a picture of a fallen tree on her phone to explain that inclement weather had caused her to miss the previous workday. Watson took the phone from her hand and indicated he was looking through it for naked pictures. Hunt asked him to stop and took her phone back. Watson replied that he would not excuse her absence and again asked when he could see her breasts.

In late August Watson made similar offensive comments towards Hunt and in mid-September, Watson asked to see Hunt's breasts several times within a few days. On September 27, 2013, after Hunt refused another advance, Watson gave her written coaching for not working her scheduled shifts and cited her June 24 absence as one such absence. Immediately following this formal discipline, Hunt decided to report

Watson's harassment to the store manager, Mark Turner, at the end of her shift.

Hunt asked Turner for a complaint form when he arrived for his shift. This was the first time Hunt informed Turner of any issues between her and Watson. When Turner asked Hunt if she knew of any witnesses, she told him to ask around about Watson's behavior. Turner collected the complaint from Hunt and provided it to human resources. Later that day, human resources informed Turner that he needed to complete an investigation into Hunt's complaint. Turner opened an investigation immediately and interviewed Watson eight days later. Watson denied making any sexual comments towards Hunt. Turner concluded Hunt's claims could not be substantiated without corroborating witnesses. Nonetheless, he required Watson to retake the company's ethics training course which included anti-harassment training. Watson completed the course on November 6, 2013. Hunt reported no incidents of harassment following the discipline.

Hunt filed a complaint in federal court on June 7, 2016, and an amended complaint on July 1, 2016. Hunt alleged she was subjected to a hostile work environment by being sexually harassed on a daily basis for five months. Wal-Mart moved for summary judgment arguing that Watson's actions did not create a hostile work environment or in the alternative that Wal-Mart had established an affirmative defense to liability as a matter of law. The district court admitted it was "unable to determine whether Plaintiff suffered a hostile work environment claim," but granted summary judgment in favor of Wal-Mart, holding it had proved the affirmative defense outlined by the Supreme Court in *Burlington Indus. v. Ellerth*, 524 U.S.

742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Because we agree, we affirm.

## II. DISCUSSION

We review a grant of summary judgment *de novo*. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 814 (7th Cir. 2017). The Court must decide whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A hostile work environment claim requires a plaintiff show: (1) the work environment was objectively and subjectively offensive, (2) the harassment complained of was based on gender, (3) the conduct was either severe or pervasive, and (4) a basis for employer liability exists. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009). The Supreme Court has held that Title VII does not demand employers be held vicariously liable for hostile work environments created by their supervisors unless it is accompanied by an adverse employment action. *Faragher v. City of Boca Raton*, 524 U.S. 775, 805–06 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). An employer may escape liability if it can show the hostile work environment was not accompanied by an adverse employment action and prove an affirmative defense. *Id.*

The *Faragher-Ellerth* defense is one such defense and requires the employer prove by a preponderance of the evidence that: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Id.* at 765.

### A.  Adverse Employment Action

As noted above, if Hunt can establish an adverse employ-ment action was taken against her, she can prevent Wal-Mart from claiming the *Faragher-Ellerth* defense. Hunt argues that a reasonable jury could conclude she was constructively dis-charged. Constructive discharge requires an employee prove her working conditions were so intolerable that she was forced into involuntary resignation. *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009). To establish such a claim a plaintiff must show working conditions "even more egregious than the high standard for hostile work environment claims." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007).

No evidence indicates that Hunt was forced into involun-tary resignation due to Watson's conduct. Quite the contrary, Hunt continued to work the same shift at the same Wal-Mart store for several years without alleging any additional inci-dents of sexual harassment. Not until more than three years later, when Hunt failed to return to work after a period of medical leave, was she let go. This failure to present evidence that her employment ceased due to an intolerable working environment precludes a finding of constructive discharge as a matter of law. *See Roby*, 579 F.3d at 786 (finding no construc-tive discharge when plaintiff "essentially just quit coming to work while [her employer] was attempting to resolve the issue").

Even if we were able to construe Hunt's delayed decision to stop showing up to work as a "resignation," we must determine whether it was "involuntary" by assessing whether the conditions were intolerable. The cases where we have

found constructive discharge are significantly more egregious than the facts at hand. Here, Hunt avers Watson made sexually suggestive comments towards her on a number of occasions; the only evidence that these incidents occurred are found in Hunt's deposition. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (noting that "an adverse party may not rest upon the mere allegations … but … must set forth specific facts showing there is a genuine issue for trial.").

The conduct in *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989) is an example. Brooms was employed by Regal Tube Company for sixteen months and during her time with the company endured numerous racist and sexually suggestive comments from a supervisor. The supervisor showed Brooms a pornographic photograph depicting "an interracial act of sodomy and told her that the photograph showed the 'talent' of a black woman." *Id.* The supervisor also showed her a racist pornographic picture involving bestiality and threatened that the photograph depicted was the fate in store for Brooms. *Id.* He then grabbed her by the arm and threatened to kill her if she moved. *Id.*

Here, the alleged conduct, while unacceptable, does not amount to constructive discharge. While comments like these have no place in the workplace, our precedent makes clear that a plaintiff must provide evidence of an environment of significantly greater severity before an actionable claim of constructive discharge materializes. Additionally, there are numerous cases in which employees were subjected to similar behavior that we held the conduct was not actionable. *See Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 528 (7th Cir. 1993) (affirming summary judgment for defendant where plaintiff

alleged her supervisor rubbed her upper leg several times, kissed her without consent, and lurched at her as if to grab her after hiding behind some bushes); *Roby*, 579 F.3d at 785 (finding no constructive discharge when a co-worker made sexually suggestive remarks, pressed his body against plaintiff's backside, put his arm around her, patted her on the buttocks, and pushed plaintiff by the hips); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 708 (7th Cir. 1995) (affirming summary judgment for defendant where supervisor removed his shoe and suggestively rubbed his foot against plaintiff's legs under the table, grabbed plaintiff's buttocks, told plaintiff he found her attractive and that he was unable to control himself around her, and asked plaintiff to go out with him); *Gleason v. Mesirow Fin.*, 118 F.3d 1134 (7th Cir. 1997) (no hostile work environment claim where supervisor referred to female customers as "bitchy" and "dumb," spoke about the size of female employee's breasts, told a female employee that he liked her in tighter skirts, told plaintiff he dreamt about holding hands with her); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2004) (no actionable harassment where harasser referenced plaintiff's "tits," commented that plaintiff was attractive and had nice legs, used profanity, made comments about his penis size, and commented that a female coworker needed to have sex); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (no sexual harassment where supervisor commented on plaintiff's looks, made grunting noises at her, indicated he was lonely, and made gestures intending to suggest masturbation). The case at hand is similar to the above cases in severity. Hunt alleges that Watson made several sexually suggestive comments that were inappropriate. But Hunt has not alleged she

was ever touched by Watson, that she was ever threatened by Watson, nor that she was concerned for her safety at any point. As such, we agree with the district court's holding that constructive discharge was not established.

## B.  Reasonable Care

The first element of the *Faragher-Ellerth* defense requires a defendant to show that it took both preventative and corrective measures to address sexual harassment. *Gentry v. Exp. Packagin Co.*, 238 F.3d 842, 846 (7th Cir. 2001). Employers must "take all steps necessary to prevent sexual harassment from occurring." *Faragher*, 524 U.S. at 806 (quoting 29 C.F.R. § 1604.11(f) (1997)). "Prevention can involve proactive steps such as constructing a reporting system for instances of sexual harassment, training employees about sexual harassment risks and what can be done to ameliorate them … and taking reasonable steps to prevent harassment once informed of a reasonable probability that it will occur." *Erickson v. Wisconsin Dep't of Corrections*, 469 F.3d 600, 606 (7th Cir. 2006).

Hunt's primary argument is that Watson's harassment of Campbell demonstrates that the measures taken by Wal-Mart were deficient. When raised properly, this argument has force. The prior harassment demonstrates that Wal-Mart was on notice that harassment was likely to occur. Wal-Mart, in fact, moved Watson to the night shift because he had been accused of harassing Campbell on the day shift. On the night shift Watson was the highest ranking employee and often alone with employees. In *Cerros*, we noted that prevention should include close monitoring when an employer has knowledge of prior harassment: "at a minimum [the employer] could have

had a manager check on the area in question on a regular basis to ensure the problem did not recur." *Cerros v. Steel Techs.*, 398 F.3d, 944, 954 (7th Cir. 2005) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1120 (9th Cir. 2004)). Indeed, EEOC guidance states, "If … the employer has an adequate policy and complaint procedure and properly responded to an employee's complaint of harassment, but management ignored previous complaints by other employees by the same harasser, then the employer has not exercised reasonable care in preventing harassment." Equal Employment Opportunity Commission, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors*, *available at www.eeoc.gov/policy/docs/harassment.html*. But Hunt failed to make these arguments in the district court and "[f]ailing to bring an argument to the district court means that you waive that argument on appeal." *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018).

Based on the arguments properly presented, no reasonable jury could find that Wal-Mart acted unreasonably. Wal-Mart had a comprehensive policy that explicitly prohibited sexual harassment. The policy states that Wal-Mart "will not tolerate any form of discrimination or harassment in any aspect of our business." Included in the list of prohibited forms of harassment is "repeated unwanted sexual flirtations, advances, or propositions." Additionally, the options for reporting retaliation were robust:

> If you experience conduct that may violate this policy or if you observe or become aware of any conduct that may violate this policy by being discriminatory, harassing or retaliatory, you

should immediately report the violation to any salaried member of management or confidentially and/or anonymously to the Global Ethics Office []. If you believe a salaried member of management may be violating this policy, you do not have to report the violation to that person. You may report the possible violation to another salaried member of management or call the Global Ethics Office.

An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent sexual harassment. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 244 (7th Cir. 2000). Here, Wal-Mart had such a policy.

Additionally, investigation into the incident was prompt and thorough. After Turner received the complaint from Hunt, he provided a copy of the complaint form to human resources. The same day, human resources instructed him to complete an investigation into the matter. This Court has often said, "a prompt investigation is the hallmark of a reasonable corrective action." *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 637 (7th Cir. 2009) (quoting *Lapka v. Chertoff*, 517 F.3d 974, 985 (7th Cir. 2008)). During the investigation, Turner asserts he met with Hunt and Watson on two separate occasions, first to gather information and then to discuss the findings and the course of action as recommended by human resources. Because Hunt did not provide Turner with any witnesses, his investigation was limited to interviewing the involved parties. The investigation was completed quickly and Turner determined he was unable to substantiate the claims. Nevertheless, Turner

reiterated to Watson the importance of a harassment-free work environment and required him to retake the company's ethics course which included anti-harassment training. Furthermore, Hunt did not allege any instances of sexual harassment occurred after the investigation was complete. "There is no question that a stoppage of harassment shows effectiveness." *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 637 (7th Cir. 2009).

In sum, we find that Wal-Mart did what a reasonable employer should. It promulgated a comprehensive sexual harassment policy, trained its employees, maintained an effective reporting system, expeditiously investigated Hunt's complaint, and communicated its zero-tolerance policy and retrained Watson even though the investigation failed to substantiate the allegations against him.

### C.  Unreasonable Delay

The second element of the *Faragher-Ellerth* defense requires the defendant to show plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities the employer provided. This is a functional test that asks "whether the employee adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm, not whether she followed the letter of the reporting procedures set out in the employer's harassment policy." *Cerros*, 398 F.3d at 952. But demonstrating a plaintiff failed to use the provided reporting procedures "will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* (citing *Ellerth*, 524 U.S. at 765; *Faragher,* 524 U.S. at 807–08).

Here, Hunt failed to take advantage of any reporting mechanisms for four months and thereby prevented Wal-Mart

from taking corrective measures. Hunt argues that she did not report Watson's behavior because she was unaware of the anonymous hotline and believed that she had to report to Turner. She further asserts that she feared retaliation for reporting. But "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty to alert the employer to the allegedly hostile environment." *Porter v. Erie Foods Intern.*, 576 F.3d 629, 638 (7th Cir. 2009) (quoting *Hill v. Am. Gen. Fin. Inc.*, 218 F.3d 639, 644 (7th Cir. 2000)). The record indicates that the anonymous phone line for reporting sexual harassment was included in Wal-Mart's sexual harassment policy and the policy also indicates that Hunt could have reported the incident to any salaried employee she felt comfortable with. While we do not intend to minimize the difficulty involved in reporting these issues, employees have a duty to utilize reporting mechanisms provided by their employer, or otherwise alert their employer of the problem, when they can do so without "undue risk or expense." *Faragher*, 524 U.S. at 806. Not only did Hunt fail to use any of these reporting mechanisms, she otherwise completely failed to alert Wal-Mart of the problem for months. *McPherson v. City of Waukegan*, 379 F.3d 430, 435 (7th Cir. 2004) ("An employer cannot be considered to have knowledge of sexual harassment unless the employee makes a concerted effort to inform the employer that a problem exists"). Because Hunt could have utilized the reporting systems implemented by Wal-Mart without undue risk or expense, but failed to for several months, we find Wal-Mart has carried its burden of showing Hunt's delay was unreasonable. *See Jackson v. Cty. of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) (holding it was

unreasonable for an employee to wait four months before reporting sexual harassment to her employer); *Roby*, 579 F.3d at 786 (holding that a five month delay under similar circumstances was unreasonable).

### III.  CONCLUSION

With the various contentions of the plaintiff considered, the judgment of the district court is hereby AFFIRMED.